**In re R & J, INC. d/b/a Seaside Restaurant and Bar, Debtor.**

**No. 90–17662–WCH.**

United States Bankruptcy Court, D. Massachusetts.

May 26, 1992.

U.S.C. § 523(a)(4).

---

**2.** Based on this finding, it is unnecessary for the Court to examine the issue of fraud under 11

317

Christopher J. Panos, Craig & Macauley, Boston, Mass., for debtor.

Robert L. Caporale, Eckert, Seamans, Cherin & Mellot, Boston, Mass., for FHMC.

## MEMORANDUM DECISION ON MOTION TO ASSUME LEASE

WILLIAM C. HILLMAN, Bankruptcy Judge.

The Debtor, R & J Inc. ("R & J"), filed a motion seeking to assume its lease with Faneuil Hall Marketplace Center ("FHMC"). FHMC vigorously opposes the motion. The Court held an evidentiary hearing on the motion and opposition.

### BACKGROUND

Faneuil Hall Marketplace ("the Marketplace") is comprised of three buildings. FHMC is the landlord pursuant to a 99 year lease with the City of Boston. The buildings are principally occupied by the 130 tenants who are engaged in the retail and restaurant business. The remainder of the tenants occupy office space in the upper floors.

In July of 1977, Robert B. Hillson assigned to R & J the lease it held from FHMC covering 8,614 square feet of space in the South Market Building in Faneuil Hall Marketplace. R & J operates a restaurant and bar at that location.

The lease provides that R & J is obligated to pay 9% of its gross sales above $2,200,000. If gross sales are less than $2,200,000.00, then R & J is required to pay 9% of that amount, or $198,000.00, per year. R & J is restricted in the use of the facility.

In December of 1990, R & J filed for protection under the Bankruptcy Code. Prior to that time R & J had defaulted on the lease. The parties appear to agree that the pre-petition amount due under the terms of the lease is $71,363.08. R & J is currently holding $73,000.00 in escrow to cure that amount. It has made all payments that have come due since the filing.

### DISCUSSION

Under 11 U.S.C. § 365(b), a debtor may not assume a lease that is in default unless the debtor cures any default, compensates for any pecuniary loss, and provides adequate assurance of future performance. The debtor carries an additional burden of proof with respect to adequate assurance if the lease is one involving a shopping center. § 365(b)(3).

With respect to the first two requirements of § 365(b)(1), the Court is satisfied that R & J has met its burden. The president of R & J testified that the debtor is currently holding an amount in escrow that is sufficient to cure the rental arrearages. Additionally, FHMC has incurred only a minimal amount of actual pecuniary loss which R & J states can be readily satisfied.

With respect to the third requirement of (b)(1), FHMC contends that the more stringent standard for adequate assurance, set forth in (b)(3), is applicable because the lease is one involving a shopping center. It argues that R & J failed to meet its burden under (b)(3). R & J responds that the lease does not involve a shopping center and, even if it did, R & J has met the higher standard required for such leases.

The Bankruptcy Code does not offer a definition of the term "shopping center" in § 365. A landlord, however, bears the burden of proving that the leased premises are located in such a center. *In re Ames Department Stores Inc.*, 121 B.R. 160, 163 (Bankr.S.D.N.Y.1990).

In a comprehensive review of the issue, the Third Circuit Court of Appeals looked

to the following criteria to determine if a lease involved a shopping center:

1. A combination of leases;
2. All leases held by a single landlord;
3. All tenants engaged in commercial retail distribution of goods;
4. The presence of a common parking area;
5. The purposeful development of the premises as a shopping center;
6. The existence of a master lease;
7. The existence of a fixed hours during which all stores are open;
8. The existence of joint advertising;
9. Contractual interdependence of the tenants as evidenced by restrictive use provisions in their lease;
10. The right to terminate upon termination of an anchor tenant;
11. Joint participation in maintenance;
12. The existence of a tenant mix;
13. The contiguity of the stores;
14. The location of the stores.

*In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1087–88 (3rd Cir.1990).

The third circuit rejected the emphasis that the lower court had placed upon the physical configuration. *Id.* It stated that "all shopping centers do not necessarily take the form of shopping malls". *Id.* The Court found that the three buildings owned by one landlord which contained shops subject to similar lease restrictions did comprise a shopping center.

■ At the hearing, FHMC established that the 130 retail and restaurant tenants at the Marketplace are subject to a master lease. All of these tenants share the same landlord. They are subject to fixed hours and share areas in common. FHMC is responsible for the maintenance of the heating, ventilation, and air conditioning systems and the tenants share in the cost. All tenants have annual dues for the cost of marketing the Marketplace.

R & J contends that the Marketplace is akin to a downtown shopping district rather than a shopping center. A portion of the space, exclusively located on the upper floors, is used for office space. The office space tenants are subject to a different form of lease than the retail tenants. Therefore, says R & J, not all tenants are subject to common expenditures and percentage leases. The departure of an anchor tenant does not trigger any provision of the lease and there is no parking space.

The issue of whether the Marketplace is a shopping center is a difficult one and the Court will happily avoid it for the moment. Instead, the Court will look to the issues that would arise if the Court were to answer the issue in the affirmative.

Under § 365(b)(3), adequate assurance of future performance of a lease in a shopping center includes adequate assurance of:

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment ... [and] ... (B) that any percentage rent due under such lease will not decline substantially.

11 U.S.C. § 365(b)(3).[1]

FHMC first asserts that R & J cannot meet its burden because it has not provided adequate assurance of its source of rent and other consideration due under the lease. R & J states that has met its burden based on several grounds.

First of all, R & J explained how it intends to service its approximately $960,-000.00 debt to the FDIC. It represented at the hearing that it has entered into an agreement with the FDIC that is waiting to be approved at another level.[2] Pursuant to that agreement and the plan of reorganization, R & J will pay the FDIC $200,000.00 upon confirmation. For three years thereafter it will make annual payments of $39,-000.00. At the end of the third year R & J will make a payment of $275,000.00.

R & J states that it will obtain the funds to make the initial payment to the FDIC from the loan proceeds it expects to receive from Haymarket Bank. It states that it has also received alternate financing from Heath Financial at a lower interest rate. The FDIC has agreed to subordinate its debt to either new money lender.

---

1. The parties agree that there is no issue with respect to subsections (C) and (D).

2. At the hearing the FDIC concurred with this statement.

FHMC argues that because the agreement with the FDIC is not yet final and is also subject to hearings on R & J's disclosure statement and plan confirmation hearings, it is too tenuous. Additionally, FHMC argues that the commitment letters are not typical and therefore not reliable. The Court finds that based on the representation of both R & J and the FDIC and the commitment letters, that this evidence is meritorious with respect to the ability to provide future financing.

In further support of R & J's position, Jerald Feldman, president of the debtor, asserts that he expects a 5 to 10% increase in revenues due to an increase in sales from now through September. He explains that sales will improve as a result of increased optimism is consumer spending, a new dance license, and the visit of the tall ships to Boston. The Court does not share a similar optimism and will give little weight to such evidence.

Even if sales were flat, however, R & J states that will operate at a profit. It substantiated this prediction with projections using actual numbers for the most recent months.[3] If a cash flow problem arises, R & J will be able to draw on a $75,000 line of credit.[4] Additionally R & J will be able to increase net operating income by $50,000, if necessary, by reducing the salaries of the president and general manager. Based on this evidence the Court finds that R & J has met its burden with respect to source of rent and other consideration.

█ FHMC also contends that R & J has failed to meet its burden with respect to the amount of the percentage rent. FHMC bases this assertion on the historical figures of R & J that show that the percentage rent has substantially declined since 1986.

FHMC states that there are two reasons why the Court must look to the historical rents when assessing the percentage rents. It looks first to subsection (A) which requires an examination of the financial condition of a potential assignee as of the time the debtor became the lessee. FHMC contends that the requirement in (A) must apply to subsection (B) because Code subsections must so interpreted. This argument fails on several grounds. Subsection (A) of § 365(b)(3) clearly applies only to assignees. Secondly, subsection (B), unlike subsection (A), refers to a prospective decline in rents and makes no reference to historical rents. Thirdly, as the Supreme Court made clear in *Dewsnup v. Timm*, —— U.S. ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992), Code sections need not be read in the manner suggested.

FHMC, contending that case law also supports the argument that the Court should look to the historical rents, cites to *In re Haute Cuisine Inc.*, 58 B.R. 390, 393 (Bankr.M.D.Fla.1986). In that case the court made passing reference to historical rents. It was not an issue decided by the Court and cannot be used for support.

R & J paid last year only $5,519 above the base rent. At most, its percentage rent will only be reduced to the base rent, an amount that cannot be considered substantial. The Court agrees with R & J that this is the rent for which FHMC bargained. Accordingly, the Court finds that R & J has met its burden with respect to the percentage rent issue.

Having found that R & J has met its burden even if the Court were to find that Faneuil Hall Marketplace was a shopping center, the Court need not address that issue. The Court finds that R & J has met its burden for assumption under 11 U.S.C. § 365. Accordingly, the Motion for Assumption of the Lease is granted. A separate order will issue.

---

**3.** There was a dispute as to what flat sales were to be used, those in the disclosure statement filed in November or those drafted prior to the hearing. Because the latter were based on actual numbers, the Court will look to them and not to the ones filed in November.

**4.** R & J states that it has also obtained an irrevocable letter of credit in favor of Faneuil to secure its obligation. The Court, however, cannot accept this evidence post-hearing.